STATE of Missouri, Plaintiff-Respondent,

v.

Keith SCOTT, Defendant-Appellant.

No. 36989.

Missouri Court of Appeals,
St. Louis District,
Division Two.

March 9, 1976.

Motion for Rehearing or Transfer
Denied April 13, 1976.

Application to Transfer Denied
May 5, 1976.

Cornelius Lane, Asst. Public Defender, St. Louis, for defendant-appellant.

John C. Danforth, Atty. Gen., Preston Dean, Asst. Atty. Gen., Jefferson City, Brendan Ryan, Circuit Atty., John F. White, Asst. Circuit Atty., St. Louis, for plaintiff-respondent.

DOWD, Judge.

Defendant appeals his conviction for second degree murder. § 559.020 RSMo 1969. After the jury failed to agree on punishment, the trial court sentenced the defendant to 35 years imprisonment. We affirm.

In the early evening of April 23, 1974, a St. Louis City policeman and a St. Louis City deputy sheriff drove to a public hous-

ing project in north St. Louis. The two men, both of whom were off-duty and attired in civilian clothes, were searching for a young woman who had forfeited bond. The two men separated, with the policeman going to the eighth floor of an apartment building.

Shortly after 7:30 p. m. there was a disturbance in the eighth floor hallway. An eyewitness saw the off-duty policeman backing down the hallway, followed by the defendant who was pointing a pistol at the policeman. The policeman told the defendant: "hold it, man, you got me wrong, I am a police officer." The policeman was waving a black billfold in his right hand, which presumably contained his police identification. The witness was positive the policeman had never reached for his own weapon. Nevertheless, the defendant shot and mortally wounded the officer.

The eyewitness recognized the assailant and notified police, who arrested the defendant about 11:20 p. m. that same night. The witness identified the defendant as the assailant both at a lineup the night of the shooting and at the trial.

Defendant's first contention is that the trial court erred in refusing to admit into evidence a videotaped statement made by the defendant to the police.

Shortly after 3 a. m. on April 24, 1974, the police obtained defendant's consent to make a videotaped statement. In this twelve-minute statement the defendant detailed almost the exact same facts he later testified to at the trial.[1]

The defendant filed a pre-trial motion to suppress the videotaped statement, but the trial court denied the motion after viewing the videotape. At the trial the state did not introduce the videotape into evidence. But the defendant tried to admit the video-tape into evidence immediately after the defendant himself had testified, in order to impeach some of the testimony of the state's eyewitness. The trial court refused.

The defendant contends the videotaped statement should have been admitted into evidence because it was "not marked by the usual hearsay dangers," and was relevant and competent to the issues involved in the case. We disagree.

The general rule is that litigant cannot introduce into evidence hearsay statements he has made with reference to the facts of the case. The exception to this hearsay rule is when the statements are a part of the res gestae. *State v. O'Neal*, 436 S.W.2d 241 (Mo.1968). The term "res gestae" refers to those exclamations and statements made by either the participants, victims or spectators to a crime immediately before, during, or immediately after the commission of the crime. The circumstances must be such that the statements were made as a *spontaneous* reaction or utterance inspired by the excitement of the occasion. There must have been no opportunity for the declarant to deliberate and to fabricate a false statement. *State v. Hook*, 432 S.W.2d 349[1] (Mo.1968).

The videotaped statement in this case clearly does not fall within the res gestae exception to the hearsay rule. The crime was committed shortly after 7:30 p. m.; the defendant was arrested about 11:20 p. m.; the videotape was recorded from 3:07 a. m. to 3:19 a. m. the next morning. The defendant had almost eight hours to reflect on the evening's happenings before he made the videotaped statement. The statement lacks the spontaneity that is the key to the admission of such hearsay. Here the defendant's reaction was not to the crime itself, but was due to the influence

---

1. At the trial the defendant testified as follows. The defendant stated the housing project that evening was alarmed by rumors that a child-molester was in the vicinity. When the defendant heard these rumors, he went to the eighth floor to find his two younger brothers who were playing there. The defendant had a gun with him. When he reached the eighth floor he heard some shots. Then some children ran by, screaming "There he is; that's him." Defendant said he then saw the victim approaching. The defendant was scared because he assumed the victim was the child-molester. The off-duty policeman told him to get out of the way but did not identify himself as a police officer. When the victim reached toward his waist, the defendant shot him, even though he admitted the victim had nothing in his hands at the time.

and questioning of the police who intervened between the crime and the videotaped statement. *State v. Lewis*, 526 S.W.2d 49[6] (Mo.App.1975).

In his appellate brief the defendant apparently concedes that the videotaped statement was not a part of the res gestae. But defendant contends the hearsay objections to the videotape are nullified in this case because the defendant took the witness stand and could have been cross-examined concerning the videotaped statement.

This argument overlooks four factors. First, at the trial the defendant testified and his recollection of the circumstances surrounding the crime was almost exactly the same as contained in his videotaped statement. The admission of the videotaped statement immediately after the defendant's own trial testimony would have subjected the jury to a repetition of the defendant's version of the essential facts. In this respect the defendant maintains the videotape was relevant and competent evidence because it would have shown the jury "the candor and demeanor of the accused shortly after the arrest." However, the jury was able to observe the defendant's demeanor in person when the latter testified at trial and repeated essentially the same assertions he had made in the videotape.

Secondly, the trial court had studied the videotaped statement during a pre-trial hearing. When the defendant at the trial stated he intended to introduce the videotape to impeach the eyewitness's testimony, the trial court correctly noted that the videotape statement was consistent with the state's evidence. Thirdly, other cases treating this same issue had excluded such statements when the defendant-declarant testified and could have been cross-examined concerning the statement. See, e. g., *State v. Hemphill*, 504 S.W.2d 62[3] (Mo.1974); *State v. O'Neal, supra.* Finally, we doubt whether even the most stringent cross-examination concerning the circumstances and content of the videotape would be sufficient to convince the trial court that the defendant had accomplished his burden of showing the hearsay statement was made under such circumstances as to assure its truth. *State v. O'Neal, supra.*

In his supplemental brief the defendant cites a federal case in support of his contention that the videotaped statement should have been admitted into evidence. *Hendricks v. Swenson*, 456 F.2d 503 (8th Cir. 1972), was a habeas corpus proceeding instituted by a prisoner who had been convicted of first degree murder in 1969 by a St. Louis County Circuit Court. See *State v. Hendricks*, 456 S.W.2d 11 (Mo.1970). The prisoner alleged the trial court should have suppressed the videotape recordings of statements he made to the police and which were shown to the jury because the statements were obtained by mental and physical coercion.

The majority found the videotaped statements had been knowingly and voluntarily made. The dissent noted that videotapes could easily cause defendants great harm because they tend to cast prisoners' physical characteristics and mental processes in a bad light. The majority replied to this argument by declaring that videotapes actually protect defendants' rights by accurately reproducing the prisoner's confession and by showing the jury whether the prisoner was coerced into making the statement.

The defendant relies on the federal court's espousal of videotapes as advancements in the field of criminal procedure and as protections for defendant's right. But we believe *Hendricks* is distinguishable. The federal case dealt solely with the state's introduction of a videotape as a confession, i. e., an admission by a party-opponent. The federal court did not treat the hearsay objections surrounding a declarant's desire to introduce his own pre-trial statement into evidence. The videotape in our case was to be introduced not to show whether the defendant was coerced, but rather to demonstrate both the defendant's demeanor and that his videotaped statement was allegedly inconsistent with the state's evidence.

We believe the trial court correctly excluded the videotape from the evidence.

The defendant's second point on appeal is that the trial court erred in giving the following instruction to the jury before its deliberations:

"If you unanimously find the defendant guilty you should fix his punishment. If however, after due deliberation, you find the defendant guilty but are unable to agree upon his punishment, you will complete the verdict form so stating, and in that event the Court will fix the punishment.

"You must bear in mind that under the law it is the primary duty and responsibility of the jury to determine whether the defendant is guilty or not guilty of the offense and if he is guilty to fix the punishment."

This instruction is essentially the first and fifth paragraphs of MAI–CR 4.50. "Notes on Use" 1 and 3 following the instruction stress its discretionary nature. The giving of such an instruction was approved by the Missouri Supreme Court in the landmark case of *State v. Brown*, 443 S.W.2d 805[6–7] (banc 1969). Since that time the instruction has been approved in numerous other cases. See *State v. Fisher*, 504 S.W.2d 281[4–5] (Mo.App.1973), and the cases cited therein.

Defendant contends the instruction was irrelevant in this case "because there was no indication or reason to believe that the jury would have any trouble in assessing a penalty if they found the defendant guilty." The trial court, however, correctly recognized that this was a case where the jury could easily find guilt but fail to agree on punishment. Here (1) the defendant was only eighteen years old; (2) the defendant admitted the shooting; (3) the defendant had never before been arrested or convicted; (4) the circumstances leading up to and surrounding the shooting were somewhat unusual. The fact that the jury could not agree on punishment merely supports the trial court's exercise of discretion in this respect.

The defendant next contends the instruction was prejudiced because "it influenced the jury to the extent that they felt no compunction in shifting the burden of assessing a penalty to the court once they had found the defendant guilty of murder in the second degree."

This argument is mere speculation concerning the psychology of the individual juror and the content of the jury's deliberations. The defendant has presented no evidence whatsoever that the instruction caused the jurors to shift their burden of assessing punishment to the trial judge. The landmark case in this area countered this same argument by noting that it would be illogical to trust the jury to determine a defendant's guilt or innocence and at the the same time be unwilling to trust the jury to follow an instruction with respect to procedure in case it should agree on guilt but not on punishment. *State v. Brown*, supra, at 811.

We conclude the trial court did not abuse its discretion when it gave this instruction.

The defendant's final contention on appeal, which also concerns the issue of punishment, is that the trial court erred in denying his motion for a mistrial because of the prosecutor's allegedly improper comment during final argument. Defendant claims the prosecutorial comment "encouraged and invited the jury to avoid its responsibility to determine punishment."

At the end of his closing argument the defense counsel told the jury: "I see no purpose for conviction of this young man and sending him down to the penitentiary and letting the doors of the penitentiary close behind him." The prosecutor's objection was sustained, and the court instructed the jury to disregard the statement.

Shortly thereafter the prosecutor remarked to the jury: "If you will look over the instructions, penitentiary, probation that is not for you to consider, if the defendant is found guilty it is not for you to determine whether he gets probation, parole or serves time. That is not for you to consider."

The trial court promptly and unequivocally sustained the defendant's objection and instructed the jury to disregard

the prosecutor's statement, but the trial judge denied the defendant's request for a mistrial. We do not believe the trial court abused its discretion in refusing to grant a mistrial. Whether a mistrial should be granted for improper argument is a matter for the trial court's discretion. *State v. Knighton,* supra. Certainly not every instance in which a prosecutor exceeds the limit of legitimate argument is cause for declaring a mistrial. *State v. Perryman,* 520 S.W.2d 126 (Mo.App.1975). Having carefully examined the entire record, we believe the trial court's action in sustaining the objection and instructing the jury to disregard the statement was sufficient to cure any possible error. The trial court observed the incident and was in a better position than an appellate court to evaluate the situation and determine the corrective measures. *State v. Knighton,* supra.

The judgment is affirmed.

CLEMENS, P. J., and McMILLIAN, J., concur.